# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Gertrude H. Allen, an individual, and Marianne E. Allen, Laurie L. Allen, and Ronald Wm. Cole as Trustees of 1988 Trust for Allen Children on behalf of themselves and all others similarly situated, | Case No. _____ <br><br> **ORIGINAL CLASS ACTION COMPLAINT** <br><br> **JURY DEMAND** |
| *Plaintiffs*, | |
| vs. | |
| Legal & General America, Inc., Banner Life Insurance Company, First American Insurance Underwriters, Inc., and Jonathan Goldstein, | |
| *Defendants.* | |

## ORIGINAL CLASS ACTION COMPLAINT

Plaintiffs Gertrude H. Allen ("Mrs. Allen"), an individual, and Marianne E. Allen, Laurie L. Allen, and Ronald Wm. Cole as Trustees of 1988 Trust for Allen Children ("Allen Trust") (collectively, the "Individual Plaintiffs"), on behalf of themselves and all other similarly situated, for their Original Class Action Complaint ("Complaint") against Legal & General America, Inc. ("L&G America"); Banner Life Insurance Company ("Banner");[1] First American Insurance Underwriters, Inc.; and Jonathan Goldstein (collectively, the "Defendants") allege as follows:

---

[1] L&G America and Banner are referred to herein as the "Banner Defendants."

# I.
## SUMMARY OF THE CASE

1.    This case stems from a conspiracy among the Defendants and others (the "Other Participants") to prey on elderly individuals by marketing and selling to them a product that did not actually exist.  The Defendants and Other Participants[2] targeted elderly individuals seeking to obtain permanent life insurance that would last the remainder of their lives.  Such individuals were in a particularly vulnerable position as their age made it difficult to obtain permanent life insurance at an affordable cost.  The Defendants and Other Participants purported to offer a solution for this dilemma to bring peace of mind to these individuals.  In reality, what Defendants and the Other Participants marketed and sold to these individuals was a sham.

2.    Defendant Banner developed flexible premium universal life insurance policies that purportedly had three features that would collectively keep the death benefit on the policies in place for the remainder of the Insured's[3] life:  (1) a low 20-year Monthly Guarantee Premium (marketed as a "term alternative"); (2) a grace period provision that would keep the policy in force after 20 years as long as the account value was sufficient to cover the monthly deduction (the "Grace Period"); and (3) and

---

[2] The "Other Participants" are the various, unnamed, individuals and entities who conspired with the Defendants to effectuate the scheme to market, sell, issue, and maintain Banner Policies. They include, *inter alia*, the agents and agencies throughout the country who marketed, sold, and issued these policies to the members of the Class.

[3] "Insured" or "Insureds", as used in the Complaint, refers to the individual whose life was insured by the policy.  "Purchaser" or "Purchasers", as used in the Complaint, refers to the owner of the policy.  While for some policies, the Insured and the Purchaser are the same individual, this is not always the case.  For instance, with respect to the Individual Plaintiffs, Mrs. Allen is the Insured and the 1988 Trust of Allen Children is the Purchaser.  As set out at Paragraph 62, the Insureds and the Purchasers (among other individuals and entities) are all members of the putative class.

Extension of Maturity Date endorsement that would keep the death benefit in force beyond age 100 with no further premiums. All of the Defendants and Other Participants then marketed and sold these insurance policies, referred to herein as the "Banner Policy" or "Banner Policies." The Defendants and Other Participants designed the Banner Policies to have an initial 20-year term during which the premiums were guaranteed to remain level (the "Guaranteed Period"). Based on written promises and representations[4] contained in the life insurance contracts and the in-force illustrations prepared by the Banner Defendants and provided to the Individual Plaintiffs and members of the Class, the Banner Policies were further designed so that, at the expiration of the Guaranteed Period, the policies could be extended through the Grace Period until the Insured reached age 100 (a period of typically ten additional years or less) with the payment of additional premiums, at which point the death benefit would remain in place for the remainder of the Insured's life with no additional premiums due after the attainment of age 100. Because the Defendants and Other Participants specifically targeted elderly individuals, the "pitch" was that the Purchaser (or other current owner of the policy) would only have to pay additional premiums for a few years during the Grace Period until the Insured reached age 100 in order to lock in the death benefit for the remainder of the Insured's life.

3.    At the time each of the Individual Plaintiffs and members of the Class purchased the Banner Policies, the Defendants represented in the policy documents that

_____

[4] As used herein, this term includes the omission of information necessary to make the statements contained in the documents fully accurate.

3

the value of the policy account during the Guaranteed Period would remain at or above $0 (*i.e.*, would never go negative during the Guaranteed Period), unless there were loans taken out against the policy. The Defendants reiterated this representation each year during the Guaranteed Period in the annual account statements that were sent to the Individual Plaintiffs and members of the Class.

4.      Unbeknownst to the Individual Plaintiffs and members of the Class, the Banner Defendants were secretly keeping a second set of books that purported to show a deficit account accruing and increasing annually on each of the policies. Specifically, the Banner Defendants secretly allocated "costs" to each of the Banner Policy accounts on a separate, undisclosed set of books, such that each account carried a "deficit" from the outset that continued to grow throughout the Guaranteed Period ("the Deficit Account"). The amount of the Deficit Account, the basis for the Deficit Account, or even the fact that such a Deficit Account existed were never disclosed to the Individual Plaintiffs and members of the Class at the time they purchased the Banner Policies. Remarkably, the Defendants sent annual account statements to the Individual Plaintiffs and members of the Class purporting to disclose the "value" of the respective Banner Policy accounts, but these account statements made no mention of the Deficit Account purportedly growing in each account and consistently showed a value of $0 or more. Moreover, the life insurance contracts provided to the Individual Plaintiffs and members of the Class when the Banner Policies were purchased contained a "Statement of Policy Cost and Benefit Information" that purported to show the value of the account through the expiration of the Guaranteed Period. The Statement of Policy Cost and Benefit Information for each

4

Banner Policy indicated an "end of year account value" at the expiration of the Guaranteed Period of $0 or more.

5.      Based on this secret second set of books, the Banner Defendants would then demand that the Purchasers (or other owner of the policy at the time) pay the balance of the enormous Deficit Account (in some cases, including the Individual Plaintiffs' case, as much as 5 or 6 times the death benefit) in order to keep the policies in place for the first year after the expiration of the Guaranteed Period.  In the Individual Plaintiffs' case, the Banner Defendants demanded that the Individual Plaintiffs pay a premium of ***$5,876,215.11*** in order to keep the policy in place (even though the death benefit remained the same--only $1,000,000) for year 21.

6.       The amount of the premiums due in year 21 to keep the Banner Policies in place was (1) unconscionable on its face; and (2) inconsistent with the numerous written representations from the Defendants in the life insurance contracts, illustrations and annual account statements regarding the value of the Banner Policies.  None of these facts were disclosed to the Individual Plaintiffs or members of the Class at the time they purchased the Banner Policies.

7.      Despite the Defendants' written promises and representations, the Banner Policies were never designed to provide a permanent death benefit through the remainder of the Insureds' lives.  Rather, the Defendants and Other Participants intentionally (and without the knowledge of the Individual Plaintiffs and members of the Class) designed the Banner Policies so that the policies could not be extended beyond the Guaranteed Period unless the Purchaser (or other owner of the policy at the time) paid the

unconscionable premium that the Banner Defendants demanded in year 21 (*i.e.*, that included the balance of the undisclosed Deficit Account).  Bringing together a collection of entities and individuals to use the mail and wires to develop, promote, sell, and issue the Banner Policies under the fraudulent pretense that these policies could remain in force for the remainder of the Insured's life constitutes a racketeering enterprise.  This racketeering enterprise injured Individual Plaintiffs and the Class by causing the Purchasers to purchase the Banner Policies that they would not have otherwise purchased and pay premiums and fees to the Defendants to keep the policies in place through the Guaranteed Period.  There were only minor, if any, variations in the written misrepresentations by the Defendants about the structure and benefits of the Banner Policies and the "value" of each of the Banner Policy accounts to the Individual Plaintiffs and members of the Class.  And while there are numerous Defendants participating in this unlawful enterprise, the invalidity of the Banner Policies to achieve their intended purpose and the written misrepresentations by Defendants predominate.

## II.
## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(d) because the Class Action Fairness Act of 2005 confers diversity jurisdiction upon this Court, as members of the proposed Class are citizens of states that are different from Defendants' state(s) of citizenship, and the aggregate amount in controversy exceeds $5,000,000. In addition, this Court has jurisdiction over Individual Plaintiffs' claims based on 28 U.S.C. §1331 and/or 28 U.S.C. §1337, which provide jurisdiction for claims

under the Racketeer Influenced and Corrupt Organizations (RICO) statute, 18 U.S.C. §1961 et seq.; and 28 U.S.C. §1367, which provides jurisdiction for supplemental state claims, including common-law fraud and conspiracy claims.

9.      Personal jurisdiction comports with due process under the United States Constitution, the long-arm statutes of California, and the provisions of 18 U.S.C. §1965(b) and (d).

10.     Without limiting the generality of the foregoing, each Defendant (directly or through agents who were at the time acting with actual and/or apparent authority and within the scope of such authority) has:

  a.      transacted business in California;

  b.      contracted to supply or obtain services in California;

  c.      availed themselves intentionally of the benefits of doing business in California;

  d.      produced, promoted, sold, marketed, and/or distributed their products or services in California and, thereby, have purposefully profited from their access to markets in California;

  e.      caused tortious damage by act or omission in California;

  f.      caused tortious damage in California by acts or omissions committed outside such jurisdiction while (i) regularly doing business or soliciting business in such jurisdiction, and/or (ii) engaging in other persistent courses of conduct within such jurisdiction, and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in such jurisdiction;

  g.      committed acts and omissions which Defendants knew or should have known would cause damage (and, in fact, did cause damage) in California to Individual Plaintiffs and members of the Class while (i) regularly doing or soliciting business in such jurisdiction, and/or (ii) engaging in other persistent courses of conduct within such

jurisdiction, and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in such jurisdiction;

h.     engaged in a conspiracy with others doing business in California that caused tortious damage in California; and/or

i.     otherwise had the requisite minimum contacts with California such that, under the circumstances, it is fair and reasonable to require Defendants to come to Court to defend this action.

11.     Venue is proper under 28 U.S.C. §1391, because acts giving rise to the causes of action alleged in this complaint arose in, among other places, this District and the harmful effects of Defendants' fraud and wrongful conspiracy were felt in, among other places, this District.  In addition, venue is proper under 18 U.S.C. §1965 because each Defendant is found, has agents, or transacts his and its affairs in this District or, in the alternative, for any such Defendant to whom this does not apply, the ends of justice require that such Defendant be brought before this Court.

### III.
### PARTIES

12.     Plaintiff Gertrude H. Allen is an individual and a resident of San Francisco, California.

13.     Plaintiff Marianne E. Allen, as Trustee of 1988 Trust for Allen Children is an individual and a resident of Sisters, Oregon. .  She is one of three trustees of the 1988 Trust for Allen Children, a trust formed under the laws of California on August 8, 1988.

14.     Plaintiff Laurie L. Allen, as Trustee of 1988 Trust for Allen Children is an individual and a resident of Roseville, California.  She is one of three trustees of the 1988 Trust for Allen Children, a trust formed under the laws of California on August 8, 1988.

15.     Plaintiff Ronald Wm. Cole, as Trustee of 1988 Trust for Allen Children is an individual and a resident of Concord, California.  He is one of three trustees of the 1988 Trust for Allen Children, a trust formed under the laws of California on August 8, 1988.

16.     Defendant Legal & General America, Inc. is a corporation formed under the laws of Delaware with its principal place of business in Frederick, Maryland.  At all relevant times, this Defendant has been licensed to conduct business and has done business in California.  This Defendant does not maintain a registered agent for service of process in California.  This Defendant may be served through its registered agent in its resident state:  Bryan R. Newcombe, 3275 Bennett Creek Avenue, Frederick, MD  21704.  This Court has personal jurisdiction over this Defendant pursuant to the Constitutions and laws of the United States and the State of California.   In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. §1965.

17.     Defendant Banner Life Insurance Company is a corporation formed under the laws of the District of Columbia with its principal place of business in Frederick, Maryland.  At all relevant times, this Defendant has been licensed to conduct business and has done business in California.  This Defendant's registered agent for service of process in California is Vivian Imperial, 818 West 7th Street, Suite 930, Los Angeles, California 90017.  This Court has personal jurisdiction over this Defendant pursuant to the Constitutions and laws of the United States and the State of California.   In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. §1965.

18.     Defendant First American Insurance Underwriters, Inc. ("FAIU") is a corporation formed under the laws of Massachusetts with its principal place of business in Needham, Massachusetts.  At all relevant times, this Defendant has been licensed to conduct business and has done business in California.  This Defendant does not have a registered agent for service of process in California.  This Defendant may be served through its registered agent in its resident state:  Allan D. Gersten, 460 Hillside Avenue, Needham, MA 02494.  This Court has personal jurisdiction over this Defendant pursuant to the Constitutions and laws of the United States and the State of California.    In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. §1965.  At all times relevant herein, this Defendant acted as a broker and agent for the Banner Defendants in the promotion, sale, and issuance of the Banner Policies.

19.     Defendant Jonathan Goldstein ("Goldstein") is an individual and resides in Needham, Massachusetts.  At all times relevant herein, this Defendant was an agent of FAIU and also acted as a broker and agent for the Banner Defendants in the promotion, sale, and issuance of the Banner Policies.  This Defendant actively marketed and promoted the Banner Policies to the Individual Plaintiffs in California and otherwise did and has done business in California.  This Court has personal jurisdiction over this Defendant pursuant to the Constitutions and laws of the United States and the State of California.    In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. §1965.  Defendants FAIU and Goldstein are collectively referred to herein as the "FAIU Defendants."

**IV.**
**NATURE OF THE CLAIMS**

20.     Individual Plaintiffs, on their own behalf and on behalf of the Class, as herein defined, bring this action against Defendants seeking the recovery of damages that Individual Plaintiffs and the Class sustained in connection with their purchase of, ownership of and/or participation in the Banner Policies that Defendants designed, developed, promoted, sold, and issued.  Individual Plaintiffs, on their own behalf and on behalf of the Class, bring claims for breach of fiduciary duty, negligent misrepresentation, disgorgement, rescission, fraud, violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§1961–1968), violations of California Business & Professions Code §17200 (and the corollary statutes of the residence states of any class member),   breach of contract/duty of good faith and fair dealing, civil conspiracy, and aiding and abetting breaches of fiduciary duty and fraud.  Individual Plaintiffs and the Class seek compensatory damages against Defendants for damages arising from the Banner Policies that the Individual Plaintiffs and Class purchased and/or owned based on the promotion and advice of Defendants from January 1, 2003 onwards.

21.     The Banner Policies are discussed in detail below.  The Defendants, acting pursuant to an elaborate and carefully devised common scheme and unlawful conspiracy, specifically targeted elderly individuals seeking affordable permanent life insurance.

22.     The Defendants, preying specifically on elderly individuals, induced the Purchasers and/or Insureds to purchase the policies with the promise contained in the policy documents for each of the Banner Policies that extending the policies through the

Grace Period until the Insured reached the age of 100 would result in the death benefit remaining in place through the remainder of the Insured's life after attaining the age of 100 without the payment of any further premiums. In other words, if the Purchasers (or other owners of the policies at the time) paid additional premiums during the short Grace Period until the Insured's 100th birthday (typically 5-10 years or less), they would then enjoy the peace of mind and security of knowing the death benefit was secure for the remainder of the Insured's life.

23.     At the time Defendants marketed and sold the Banner Policies to the Purchasers and/or the Insureds, Defendants knew that, during the entire Guaranteed Period, each of the Banner Policy accounts were accruing the Deficit Account on a secret, second set of books that was not disclosed on the policy statements or otherwise to the Individual Plaintiffs and members of the Class. As a result of the undisclosed Deficit Account, the Purchasers (or other owners of the policies at the time) would not be able to extend the policies beyond the Guaranteed Period unless they paid the balance of the Deficit Account (that had grown during the Guaranteed Period to be up to 5 to 6 times the death benefit, in some cases) as part of the premium due in the first year after the expiration of the Guaranteed Period.

24.     Under no circumstances would a reasonable person be willing to pay a one-year premium of 5x or 6x in order to receive a death benefit of 1x. The second set of books containing the purported Deficit Account was never disclosed to the Individual Plaintiffs and Class at all until and unless either (1) the Guaranteed Period ended and the Purchaser (or other owner) sought to extend the policy coverage or (2) the Individual

Plaintiffs or Class otherwise specifically requested an illustration from Banner containing a premium schedule for the Grace Period until the Insured reached age 100, which would only occur in the rare instance that the policy owner specifically requested a schedule of premiums needed to keep the policy in force beyond the Guaranteed Period.

25.    Importantly, at no time prior to the Purchasers purchasing the Banner Policies did Defendants disclose to Individual Plaintiffs and the Class that a Deficit Account would be accruing during the entire Guaranteed Period and that, because of this growing deficit, Individual Plaintiffs and the Class would not be able to extend the policies beyond the Guaranteed Period unless they paid a premium of several times the death benefit in year 21.

26.    In all cases, this Deficit Account greatly exceeded (in some cases by a multiple of at least 5 or 6) the death benefit of the policy. In other words, the Defendants knew that there was no chance that any of the Individual Plaintiffs or the Class, exercising reasonable judgment, would extend the policy beyond the Guaranteed Period. Indeed, this is exactly how the Banner Defendants designed the Banner Policies.

27.    It was not reasonable to expect that Individual Plaintiffs and the Class were knowledgeable and they were not, in fact, knowledgeable about complex insurance matters. Indeed, the Defendants intentionally withheld from Individual Plaintiffs and the Class the fact that the accounts contained a hidden Deficit Account on a secret second set of books that was growing year after year. The Defendants provided the Individual Plaintiffs and the Class with account statements that purported to show the annual account value of each of the Banner Policies and these account statements never

disclosed the amount or even the existence of the hidden Deficit Account that Defendants had allocated to each of the Banner Policy accounts.  Individual Plaintiffs and the Class detrimentally relied on Defendants as their trusted insurance and underwriting advisors for comprehensive insurance and underwriting advice.

28.     Defendants promoted, sold and issued the Banner Policies knowing that if a policy owner paid the guaranteed premium during the entire Guaranteed Period but the Insured did not die during the Guaranteed Period, the policy would then have to be lapsed due to the undisclosed and massive Deficit Account.  Despite this knowledge, the Defendants nevertheless marketed and promoted the Banner Policies as permanent life insurance that provided an affordable way for elderly individuals to guarantee a death benefit throughout the remainder of their lives.

29.     At all times alleged herein, Defendants knew that Individual Plaintiffs and the Class placed reasonable trust and faith in Defendants as the insurance and underwriting advisors for Individual Plaintiffs and the Class with respect to all aspects of the Banner Policies.

30.     Based on Defendants' promises, misrepresentations, and omissions, Individual Plaintiffs and the Class paid substantial premiums and fees to Defendants to issue the Banner Policies and continue to keep the policies in force during the Guaranteed Period on each respective Banner Policy.

**A.    The Banner Policies Promoted to the Purchasers.**

**1.    About the Defendants.**

31.    L&G America was formed as a holding company in 1981 by Legal & General Group Plc ("L&G Group").  L&G Group claims to be a top 10 global asset manager and the 7th largest insurer in the world.  According to L&G Group, it has over 10 million customers for life insurance, pensions, investments and general insurance plans and over 3,000 institutional clients.  L&G Group also reported $1 trillion in worldwide assets under management on behalf of investors, policyholders and institutions as of June 30, 2016.

32.    L&G America claims to have 1.3 million U.S. customers and to be a top five provider of term life insurance in the United States, issuing more than $53 billion in new coverage in 2017.  L&G America further claims to have over $703 billion in life insurance in force and nearly $5 billion in assets.

33.    Shortly after its formation, L&G America purchased Government Employees Life Insurance Company ("GELICO"), an insurance company that was chartered in 1949.  GELICO's name was changed to Banner Life Insurance Company in 1983.  According to L&G America, the purpose of the name change was to "signify[] our flagship position with Legal & General in the U.S."

34.    In 2011, L&G America, Banner, and Banner's wholly-owned subsidiary William Penn Life Insurance Company of New York ("Penn Life") consolidated their marketing identities into the single brand, Legal & General America.

35.    Banner underwrites and issues life insurance policies under the L&G American brand in the District of Columbia and all 50 states of the United States except New York.[5]  Banner policies are sold through independent agents and brokers throughout the United States.

36.    Banner claims:

"[T]he heart of our business is a genuine concern about our policyholders.  We deeply believe in the value of life insurance protection because we know how beneficial it can be.  You can count on us to help provide financial security for your loved ones in the event you are no longer here to do that yourself."

37.    Banner purports to be "committed to business practices that will make sure we will be here when you need us most" and "business practices that will allow us to keep our promises to you."  As explained herein, none of their promises were true when it came to the Banner Policies sold to the Insureds.

**2.    About Universal Life Insurance.**

38.    In broad terms, there are two general categories of life insurance:  term insurance and permanent insurance (also called cash value life insurance).  The most common type of term insurance has a guaranteed level premium for a limited period, usually 10 to 30 years, followed by much higher premiums until a maximum renewal age. Permanent insurance, on the other hand, offers coverage that does not expire, provided that the premiums are paid to keep the policy in force.

---

[5] William Penn Life is the company that underwrites and issues life insurance policies under the L&G America brand for the state of New York.

39.     Within the broad category of permanent insurance, there are many variations in product offerings.  One popular type is universal life, which offers premium flexibility (you can choose the amount and timing of premiums, within limits) and transparency (you can see the debits and credits to the internal account).  Within the universal life family, there are variations distinguished by the investment strategy used to generate earnings that are credited to the account value.  The main variations are fixed, variable, and indexed.

40.     Beginning in the 1980's, some companies enhanced their universal life products by offering a "no-lapse guarantee" (also called a "secondary guarantee") that kept the policy in force even if there was no money in the policy (that is, a $0 account value).  The terms of these guarantees varied widely, and the guarantees gradually became more favorable to the policy owner.  Products that offered lifetime guarantees were often called "no-lapse universal life" or "secondary guarantee universal life", highlighting the importance of the no-lapse guarantee in the product design.  No-lapse universal life usually had lower guaranteed premiums than the life insurance industry's oldest type of cash value life insurance:  whole life.

41.     In the 1990s, some companies offered universal life products with a limited no-lapse guarantee that was designed to compete with level-premium term insurance. After an initial Guaranteed Period, such as 20 years, the policy owner could keep the policy in force by maintaining a positive account value, similar to typical universal life policies. There would be no need to convert to a separate permanent policy, because the existing "term UL" policy would provide permanent coverage.  These term UL policies

could be especially attractive to older insureds, who would value the low guaranteed premiums in the early years as well as the ability to keep the policy in force for life

42.     The Banner Policies designed, promoted, and sold by the Defendants herein purported to have all of the benefits of a level-premium term policy as well as a universal life policy.  But, as explained herein, this was not the case.

**B.     The Individual Plaintiff's Banner Policy.**

**1.     Based on Defendants' Written Misrepresentations, the Individual Plaintiffs purchase a Banner Policy in 2003.**

43.     The Banner Defendants sell life insurance through brokers such as Goldstein and FAIU.  The Banner Defendants appoint the broker to act on their behalf. The broker is an authorized agent of the Banner Defendants and represents the Banner Defendants.  Although the brokers are designated as independent contractors and not employees of the Banner Defendants, the Banner Defendants are legally responsible for the broker's conduct in carrying out this agency relationship.

44.     In September 2003, Goldstein sold the Individual Plaintiffs a Banner Policy from Banner on the life of Mrs. Allen.  The Individual Plaintiffs' Banner Policy was purchased by the Allen Trust.  The Policy Date was September 10, 2003 and the Issue Date was September 12, 2003.  The death benefit was $1,000,000 and the beneficiary was the Allen Trust.  Mrs. Allen was 76 years old at the time this Banner Policy was issued.

45.     The Guaranteed Period during which the premiums would be level and the death benefit would be guaranteed was 240 months, or 20 years, as set out in the policy document.  In other words, the Guaranteed Period (and, thus, the guarantee of level

premiums) was to expire when Mrs. Allen reached the age of 96, at which point the Allen Trust would need to pay additional premiums in years 21 through 24 through the Grace Period in order to keep the policy in place until Mrs. Allen reached age 100. The Defendants told the Individual Plaintiffs in the life insurance contracts for the Banner Policies that, upon reaching age 100, the death benefit would be in place for the remainder of Mrs. Allen's life with no additional premiums being due. The guaranteed level annual premium during the Guaranteed Period was $24,220 (*i.e.*, the $2,018.33 Monthly Guarantee Premium times 12).

46.    The possibility of keeping the permanent death benefit in place for the remainder of Mrs. Allen's life was a factor in the Individual Plaintiffs' decision to purchase the Banner Policy and continue to pay premiums through the Guaranteed Period. The Individual Plaintiffs would not have purchased the Banner Policy or continued to pay premiums through the Guaranteed Period had they known that, due to the undisclosed Deficit Amount, they would not be able to keep the Banner Policy in force after the expiration of the Guaranteed Period unless they paid an unconscionable premium of almost 6 times the death benefit in the first year after the expiration of the Guaranteed Period.

47.    The policy documents provided to the Individual Plaintiffs at the time they entered into the Banner Policies contained a Statement of Policy Cost and Benefit Information that represented to the Individual Plaintiffs that the "end of year account value" at the expiration of the Guaranteed Period would be $0. The life insurance

contracts also gave no indication whatsoever that the account values could ever go negative unless there was an outstanding loan on the policy.

**2.    The Individual Plaintiffs Pay Premiums to Defendants for Approximately 15 Years Based on the Promise of a Guaranteed Death Benefit for the Remainder of Mrs. Allen's Life.**

48.    From September 2003 through the present, the Individual Plaintiffs have paid the guaranteed level premium of $24,220 to keep the Banner Policy in place.  As of the date of filing, the total premiums paid equaled $363,300.  The total premiums to be paid through the expiration of the Guaranteed Period will equal $484,400.

49.    Throughout this entire period, the Individual Plaintiffs received annual statements from the Banner Defendants that purported to show the value of the Banner Policy account.  At no time did any of these annual statements indicate that the account value was negative or that there was a deficit accruing on the account.

50.    At all times during this period, the Individual Plaintiffs were paying these premiums under the belief (based on the written representations of the Defendants) that in year 21, the Individual Plaintiffs could keep the Banner Policy in place for an additional four years (until Mrs. Allen reached age 100) with the payment of additional premiums. At no time during this period (until the August 22, 2018 illustration discussed in Paragraph 55 herein) did the Defendants or any Other Participants ever inform the Individual Plaintiffs that the value of the Banner Policy account as stated in the annual account statements the Banner Defendants sent to the Individual Plaintiffs was inaccurate and that the Banner Defendants were keeping a secret second set of books with an enormous (and growing) Deficit Account that was being applied to the policy.  At no

time during this period (until the August 22, 2018 illustration discussed in Paragraph 55 herein), did the Defendants or any Other Participants ever tell the Individual Plaintiffs that the Individual Plaintiffs would have to pay the enormous balance of the Deficit Account the Banner Defendants were secretly allocating to the policy account as part of the premium in the first year after the expiration of the Guaranteed Period.

3.    **The Individual Plaintiffs Attempt to Sell the Banner Policy and Discover For the First Time That the Promise of a Guaranteed Permanent Death Benefit Was a Sham.**

51.    In the spring of 2018 (with approximately five years remaining in the Guaranteed Period), the Individual Plaintiffs began exploring the possibility of the Banner Policy having a present value that could be realized in a life settlement.

52.    On or about April 3, 2018, Laurie Allen, the daughter of Mrs. Allen and one of the co-trustees of the Allen Trust, contacted Banner and specifically asked if there was any possibility that the value of the Individual Plaintiffs' Banner Policy account could go negative during the Guaranteed Period if the monthly guaranteed premiums were timely paid.  Consistent with the written representations contained in the life insurance contract and the annual statements that the Banner Defendants had been sending to the Individual Plaintiffs each year since the purchase of the Banner Policy, the Banner representative responded with an unequivocal "no" and explained that a negative balance could only happen when there was an outstanding loan on the policy, which did not apply to the Individual Plaintiffs' Banner Policy.  This representation was repeated to Laurie Allen by a Banner representative on at least one more occasion.

53.     The Individual Plaintiffs then obtained a valuation of the Banner Policy and determined that the policy could have significant value in the life settlement market.  This valuation was based on the guaranteed monthly premium being paid through year 20, the nonguaranteed premiums being paid in years 21 through 24 (*i.e.*, the Grace Period), and no premiums at all being paid thereafter due to Mrs. Allen reaching the age of 100, consistent with the life insurance contracts and annual statements the Banner Defendants sent to the Individual Plaintiffs.  *Every* Annual Statement received from the Banner Defendants during the Guaranteed Period always reflected that there would be an account value and surrender value of $0 at the expiration of the Guaranteed Period and there was no indication whatsoever in these Annual Statements or in any other communications from the Defendants or Other Participants that the policy account would ever have a negative value during or at the expiration of the Guaranteed Period.

54.     To assist with the marketability of the policy in the life settlement market, the Individual Plaintiffs asked the Banner Defendants to provide them with an illustration that confirmed the premium schedule used in the valuation of the policy.

55.     On August 22, 2018, the Banner Defendants provided an illustration that indicated **for the first time** that the required premium to keep the Individual Plaintiffs' Banner Policy in place for year 21 was ***$5,876,215.11*** (almost 6 times the death benefit of $1,000,000).  This is in stark contrast to the representations set out in the life insurance contract.  Based on the maximum monthly cost-of-insurance charge and other maximum charges set forth in that contract, the maximum premium to keep the Banner Policy in place for year 21 would be $433,534.

56.    The Individual Plaintiffs requested an explanation from the Banner Defendants.    After weeks of delay, the Individual Plaintiffs were finally connected to Banner Life "Team Lead" Cynthia Greger who explained to the Individual Plaintiffs for the first time that there was a Deficit Account on an undisclosed second set of books showing a negative value of approximately $500,000 in year 1 that had grown to over $5,000,000 during the Guaranteed Period regardless of the fact that all of the guaranteed premiums had been timely paid during the Guaranteed Period.

57.    When the Individual Plaintiffs asked Greger where the Deficit Account was disclosed in the life insurance contract, Greger was unable to point to anything in the life insurance contract.    When the Individual Plaintiffs asked Greger why the annual statements showed an account value and surrender value of $0 and never disclosed a negative value, Greger again had no explanation.

58.    When the Individual Plaintiffs asked Greger why Laurie Allen was told by Banner representatives on at least two occasions that the account value of the Individual Plaintiffs' Banner Policy could not go negative during the Guaranteed Period (consistent with the written representations contained in the life insurance contracts and annual statements), Greger said she had access to a screen that the other Banner representatives did not have and she (Greger) could see the purported Deficit Account.    The Individual Plaintiffs requested that Greger print the "screen" that Greger indicated she had access to and provide it to the Individual Plaintiffs.    Greger refused to send this documentation to the Individual Plaintiffs.    To date, the Individual Plaintiffs have not been provided any documentation to support the claimed Deficit Account or any further explanation of how

this claimed Deficit Account grew from $500,000 to over $5,000,000 without any disclosure to the Individual Plaintiffs and despite the fact that the Individual Plaintiffs fully complied with their end of the bargain (*i.e.*, timely payment of the guaranteed premiums during the Guaranteed Period).

## V.
## CONSPIRACY ALLEGATIONS

59.    Each of the Defendants and their co-conspirators, including the various unnamed independent agents and brokers who sold and issued the Banner Policies to the members of the Class (*i.e.,* the Other Participants) involved in the Banner Policies purchased by Allen and the other Insureds in the Class conspired with one another by agreeing to design, promote, sell, issue, and maintain the Banner Policies for the purpose of receiving and splitting substantial fees and premiums (the "Defendants' Arrangement"). The receipt of those fees and premiums was the primary, if not sole, motive in the development, sale and issuance of the Banner Policies by Defendants and the Other Participants.

60.    The receipt of fees and pecuniary gain from those fees was the primary motive for the conduct of the Defendants and the Other Participants; the provision of a legitimate and commercially reasonable insurance product to clients was not a motivating factor for the Defendants' conduct alleged herein.

61.    The Defendants and the Other Participants conspired to perpetrate a fraud on Individual Plaintiffs and the Class, each with knowledge of the object of the conspiracy. Each of the Defendants and the Other Participants had particular roles and

responsibilities in connection with the design, marketing, sale, and issuance of the Banner Policies. In addition, the Defendants and the Other Participants authorized, ratified and/or affirmed the fraudulent misrepresentations and/or omissions made by each of the Defendants and the Other Participants. Each Defendant committed at least one overt act in furtherance of the unlawful conspiracy.

## VI.
## CLASS ALLEGATIONS

62. Individual Plaintiffs bring this action on their own behalf and, pursuant to Rule 23(b)(l)(A) and/or (b)(3) of the Federal Rules of Civil Procedure, as a class action on behalf of themselves and the nationwide class of all persons (the "Class Members," the "alleged class" or the "Class") defined below against all Defendants:

> All Insureds, Purchasers, policy owners, and beneficiaries of any universal life insurance policies (including but not limited to the Banner Policies)[6] issued by any of the Defendants or any other account that any of the Defendants held out as a life insurance policy from January 1, 2003 to the present, inclusive, and for which (1) the insurer allocated a Deficit Account to such policy account that was kept on an internal set of books and (2) the Insured under the policy did not die and have the death benefit paid to the beneficiaries within the Guaranteed Period (defined herein) or any similar guaranteed premium term. Excluded from the Class are: Defendants; Defendants' parents, subsidiaries, and affiliates; anyone receiving referral, commission or promotional fees for the No Lapse ULs or any other life insurance policy or other account sold by any of the Defendants; and federal governmental entities.

63. Individual Plaintiffs believe that the Class consists of dozens if not hundreds of Class Members or more geographically dispersed throughout the United States such that joinder is impracticable. These Class Members may be identified from information and records maintained by Defendants, or third parties.

---

[6] The universal life policies referred to herein, include the Banner Policies as well as, by way of example, No-Lapse Universal Life Policies and Term Universal Life Policies.

64.     Individual Plaintiffs and the Class Members each and all have tangible and legally protectable interests at stake in this action.

65.     The claims of the Individual Plaintiffs and the Class Members have a common origin and share a common basis. The claims of all Class Members originate from the same fraudulent transactions predicated by the Defendants.

66.     The Individual Plaintiffs state a claim for which relief can be granted that is typical of the claims of the Class Members. Thus, the class representatives have been the victims of the same illegal and wrongful acts as each member of the class.

67.     If brought and prosecuted individually, each of the Class Members would necessarily be required to prove the instant claim upon the same material and substantive facts, upon the same remedial theories and would be seeking the same relief.

68.     The claims and remedial theories pursued by the Individual Plaintiffs are sufficiently aligned with the interests of the Class Members to ensure that the universal claims of the alleged class will be prosecuted with diligence and care by the Individual Plaintiffs as representatives of the Class.

69.     There are questions of law and fact common to the alleged class. Such common questions include, *inter alia*:

a.      Whether Defendants and the Other Participants defrauded Individual Plaintiffs and members of the Class by misrepresenting in the written materials provided to the Individual Plaintiffs and members of the Class that the Banner Policies were permanent insurance that could provide a death benefit for the remainder of the Insureds' lives;

b.      Whether Defendants and the Other Participants defrauded Individual Plaintiffs and members of the Class by providing Individual

26

Plaintiffs and members of the Class with written annual account statements and written illustrations that purported to reflect the value of the respective Banner Policy account when, in reality, the Defendants were secretly allocating enormous Deficit Accounts to each Banner Policy account on a secret second set of books that were not disclosed to any of the Individual Plaintiffs or members of the Class on the written account statements and written illustrations;

c.     Whether Defendants and the Other Participants defrauded Individual Plaintiffs and members of the Class by intentionally concealing from Individual Plaintiffs and members of the Class in the written account statements and written illustrations provided to the Individual Plaintiffs and members of the Class the fact that Defendants were allocating enormous Deficit Accounts to each Banner Policy account that would result in the Individual Plaintiffs and members of the Class not being able to extend the Banner Policy beyond the Guaranteed Period;

d.     Whether Defendants and the Other Participants defrauded Individual Plaintiffs and members of the Class by mispresenting in the written policy documents that were provided to the Individual Plaintiffs and members of the Class that the Banner Policies provided lifetime coverage when, in reality, they were simply term policies that could not, for all practical purposes, be extended beyond the Guaranteed Period;

e.     Whether Defendants and the Other Participants conspired and/or aided and abetted each other in furtherance of the unlawful acts alleged herein and incorporated by reference;

f.     Whether Defendants and the Other Participants engaged in a pattern of racketeering activity in violation of RICO codified at 18 U.S.C. § 1961, *et seq.* based on the unlawful acts alleged herein and incorporated by reference;

g.     Whether Defendants' and the Other Participants' overt and/or predicate acts in furtherance of the conspiracy and/or aiding and abetting, based on the unlawful acts alleged herein and incorporated by reference, resulted in or proximately caused and causes injury to the Individual Plaintiffs' and Class Members' business or property or irreparably harmed and harms the Individual Plaintiffs and the alleged class and if so, the appropriate relief to which they are entitled;

h.   Whether Defendants' acts, practices, and written representations, based on the unlawful acts alleged herein and incorporated by reference, constitute violations of applicable law for which Individual Plaintiffs and the Class Members are entitled to recover restitution or damages or for which disgorgement of ill-gotten monies is appropriate;

i.   Whether Defendants' actions, based on the unlawful acts alleged herein and incorporated by reference, constitute mail and wire fraud; and

j.   Whether Defendants have been unjustly enriched through the unlawful acts alleged herein and incorporated by reference.

70.   Adjudications with respect to individual members of the Class could, as a practical matter, be dispositive of the interests of the other Class Members who are not parties to the action or could substantially impair or impede their ability to protect their interests.

71.   Defendants have acted or refused to act on grounds generally applicable to the Class, making appropriate final relief with respect to the Class as a whole. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the alleged Class that would establish incompatible standards of conduct for the party or parties opposing the Class.  Such incompatible standards, inconsistent or varying adjudications on what, of necessity, would be the same essential facts, proof and legal theories, would create and allow to exist inconsistent and incompatible rights within the Class.  Further, the failure to permit this cause to proceed as a class action under Rule 23(b)(1)(A) would

be contrary to the beneficial and salutary public policy of judicial economy in avoiding a multiplicity of similar actions.

72.    The questions of law and fact applicable to the Class predominate over individual questions.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Each of the class members was involved in the purchase of one or more Banner Policy or similar universal life policy.  These policies were represented by Defendants, uniformly in written documents provided to the Individual Plaintiffs and members of the Class, to be a life insurance policy that could function as a term insurance alternative during an initial Guaranteed Period and could be kept in force beyond that initial period by paying additional premiums to age 100, at which time the death benefit would be guaranteed for the remainder of the Insured's life at no additional cost.  The written representations made to each member of the Class were sufficiently similar to predominate.  Therefore, certification is appropriate under Rule 23(b)(3).  Failure to permit this action to proceed under Rule 23 would be contrary to the public policy encouraging the economies of attorney and litigant time and resources.

73.    The Individual Plaintiffs allege that they are willing and prepared to serve the Court and proposed Class in a representative capacity with all of the obligations and duties material thereto.

74.    The self-interests of the named Class representatives are co-extensive with and not antagonistic to those of the absent Class Members. The proposed representatives will undertake to well and truly protect the interests of the absent Class Members.

75.    The Individual Plaintiffs have engaged the services of counsel indicated below. Individual Plaintiffs' counsel are experienced in complex class litigation involving *inter alia* insurance products and will adequately prosecute this action and will assert, protect, and otherwise represent well the named Class representatives and absent Class Members.

76.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. There will be no difficulty in the management of this action as a class action.

77.    The Individual Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse to or which directly and irrevocably conflict with the interests of other Class Members.

### VII.
### ALLEGATIONS RELATING TO RICO

78.    Individual Plaintiffs are "persons" within the meaning of 18 U.S.C. §1964(c).

79.    At all times relevant hereto, each of Individual Plaintiffs and the Defendants were and are "persons" within the meaning of 18 U.S.C. §1961(3).

**A.    Enterprise.**

80.    An enterprise need not be a specific legal entity but rather may be "any union or group of individuals associated in fact although not a legal entity."

81.     In this case, the enterprise ("Enterprise") for RICO purposes consists of (1) the Defendants; (2) the Other Participants; and (3) all other persons and entities that solicited persons to purchase a Banner Policy or similar universal life policy for the alleged purpose of generating and sharing fees and commissions generated from the policies.

82.     These individuals and entities individually and through their agents represented to their victims that the Banner policies or similar universal life policies were a form of permanent life insurance with a death benefit that would remain in place for the entirety of the insured's life so long as premiums were timely paid.  In reality, these individuals and entities knew that the premium(s) required to keep the policies in place after the expiration of the Guaranteed Period were so outrageous, unreasonable and prohibitive that no reasonable consumer would ever decide to keep the policies in place beyond the Guaranteed Period.  In essence, these individuals and entities sold the Class term life insurance as permanent insurance.  The scheme to sell the Banner Policies was devised solely to facilitate the sale of the policies, resulting in the generation of significant fees and commissions to the Defendants.  The Defendants and the Other Participants have made millions of dollars through this scheme and, as of this time, it remains ongoing.

83.     Defendants sought out as clients elderly individuals (*i.e.*, the Insureds) who were seeking permanent life insurance with a death benefit for the remainder of their lives.  Defendants knew that the Insureds were in a vulnerable position due to the limited life insurance options available to these individuals at their advanced ages.  Defendants

capitalized on the Insureds' circumstances by offering the promise of affordable permanent life insurance with a lifetime death benefit to the Insureds' beneficiaries (*i.e.*, the Banner Policies). As discussed herein, the Defendants had full knowledge that the Banner Policies would not fulfill the promise of a lifetime death benefit. In fact, the Defendants specifically designed the Banner Policies in a way that ensured the promise of the lifetime death benefit would not be fulfilled.

84.    The Defendants and the Other Participants engaged in a common plan, transaction and course of conduct described herein in connection with the design, promotion and sale of Banner Policies, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and a course of business that operated as a fraud upon the Individual Plaintiffs and the Class, the primary purpose and effect of which was to generate huge and unlawful fees and commissions by fraudulently selling an insurance product under the guise of selling guaranteed permanent life insurance when in reality the Banner Policies were nothing more than term life insurance policies that, for all practical purposes, could not be extended beyond their initial Guaranteed Period.

85.    While the Defendants and the Other Participants participated in the Enterprise and were a part of it, the Defendants and the Other Participants also had an existence separate and distinct from the Enterprise.

86.    Defendants and the Other Participants maintained an interest in and control of the Enterprise and also conducted or participated in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

87.    Defendants and the Other Participants' control and participation in the Enterprise were necessary for the successful operation of Defendants' scheme. The Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engaged.

**B.    Operation of the RICO Enterprise.**

88.    Each of these participants were vital to the issuance of the Banner Policies, played an important role in the success of the Enterprise, and independently controlled their own part in the Enterprise or knowingly implemented the decisions of others in the Enterprise:

a.    The Banner Defendants were responsible for creating, designing and establishing the Banner Policies.  Additionally, they were responsible for producing misleading marketing and promotional materials, misleading policy documents, misleading and inaccurate illustrations, misleading and inaccurate annual statements, and other misleading communications regarding the Banner Policies, as well as training and supervising agents such as the FAIU Defendants with respect to the sale and operation of the Banner Policies.

b.    The FAIU Defendants (along with various Other Participants) were the front-line promoters of the Banner Policies.  As explained herein, the FAIU Defendants (as agents and representatives of the Banner Defendants), introduced and sold the Banner Policies to the Individual Plaintiffs pursuant to the Defendants' and Other Participants' pre-arranged plan.

89.    The Defendants intended to, and did, commit mail and wire fraud in connection with the promotion, sale and continued operation of the Banner Policies since they used the mails and wires in creating, designing, establishing, promoting, selling, issuing, and continuing to maintain the Banner Policies.  The Defendants' racketeering

activity in creating, designing, establishing, promoting, selling, issuing, and continuing to maintain the Banner Policies involved numerous false and misleading misrepresentations and omissions that amount to a scheme or artifice to defraud.

90.    As a result of Defendants' unlawful acts, the Individual Plaintiffs and members of the Class, purchased and/or otherwise participated in the Banner Policies believing (based on the Defendants' false representations and intentional omissions) that the policies provided permanent life insurance with a guaranteed benefit for the remainder of the Insured's life.

**C.    Predicate Acts.**

91.    With respect to the activities alleged herein, the Defendants and Other Participants acted at all times with malice toward the Individual Plaintiffs and the Class, intending to engage in the conduct complained of for the benefit of Defendants and with knowledge that such conduct was unlawful.  Such conduct was done with actionable wantonness and reckless disregard for the rights of Individual Plaintiffs and the Class, as well as the laws to which the Defendants are subject, the same amounting to actionable wantonness.

92.    With respect to the activities alleged herein, each Defendant and Other Participants agreed to the operation of the transaction or artifice to deprive Individual Plaintiffs and the Class of property interests.  In furtherance of these agreements, each Defendant also agreed to interfere with, obstruct, delay or affect interstate commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants were not entitled.

93.     With respect to the overt acts and activities alleged herein, each Defendant conspired with each other, the Other Participants, and with others not named as Defendants in this Complaint, to violate 18 U.S.C. §1962(c) and 18 U.S.C. §1962(d). Each Defendant also agreed and conspired with each other Defendant to participate, directly or indirectly, in interfering with, obstructing, delaying or affecting commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants were not entitled.

94.     The numerous predicate acts of mail and wire fraud described *infra* in ¶¶ 97-99 in addition to other fraudulent acts, are part of separate fraudulent transactions by Defendants designed to defraud the Individual Plaintiffs and the Class of money and property interests under false pretenses. As victims of these unlawful patterns of illegal activity, Individual Plaintiffs and members of the Class have and continue to suffer losses as a result of these activities.  The acts which caused injuries to the Individual Plaintiffs and members of the Class were performed for financial gain.

95.     In carrying out the overt acts and fraudulent transactions described herein, the Defendants engaged in, *inter alia*, conduct in violation of federal laws, including 18 U.S.C. §§1341-1346, and 18 U.S.C. §1961 et seq.

96.     Section 1961(1) of RICO provides that "racketeering activity" means any act indictable under any of the following provisions of Title 18, United States Code: §1341 (relating to mail fraud), §1343 (relating to wire fraud), and §1346 (relating to scheme or artifice to defraud).

**D.     Violations of 18 U.S.C. §§1341 and 1343.**

97.     Individual Plaintiffs repeat and reallege each and every prior allegation in this Complaint as if fully set forth herein.

98.     For the purpose of executing and/or attempting to execute their transaction to defraud and to obtain money by means of false pretenses, representations or promises, the Defendants and their co-conspirators, in violation of 18 U.S.C. §1341, placed in post offices and/or in authorized repositories for mail matter and things to be sent or delivered by the Postal Service and received matter and things therefrom including but not limited to  policy contracts, illustrations, instructions, correspondence, marketing materials, advertisements, and Annual Statements.  These materials include, *inter alia*:

a.     September 12, 2003 policy contract;

b.     September 13, 2008 Universal Life Insurance Policy Annual Statement;

c.     September 26, 2009 Universal Life Insurance Policy Annual Statement;

d.     September 12, 2012 Universal Life Insurance Policy Annual Statement;

e.     May 17, 2013 letter to Allen Trust regarding increase in account value;

f.     August 19, 2015 letter to Allen Trust regarding monthly deductions;

g.     September 12, 2017 Universal Life Insurance Policy Annual Statement;

h.     November 11, 2017 Life Insurance Illustration;

i.     February 20, 2018 Life Insurance Illustration;

j.     April 12, 2018 Life Insurance Illustration;

     k.     August 13, 2018 Life Insurance Illustration;

     l.     August 22, 2018 Life Insurance Illustration;

     m.     September 13, 2018 Universal Life Insurance Policy Annual Statement; and

     n.     October 4, 2018 Life Insurance Illustration.

99.     Each of the policy contracts, illustrations, and Annual Statements sent in the mail by the Defendants to Individual Plaintiffs and members of the Class served at least two roles in the Enterprise.  First, these documents, standing alone, were fraudulent.  Defendants knew that the Defendants were internally booking enormous Deficit Accounts within each policy account on a secret second set of books, but intentionally withheld this information from the Individual Plaintiffs and the Class in these communications with the Individual Plaintiffs and the Class.  Due to the Deficit Account that the Defendants were carrying on each of the policy accounts, Defendants also knew that they were not providing actual permanent life insurance with a lifetime death benefit to Individual Plaintiffs and members of the Class.  Second, in addition to being fraudulent standing alone, these documents were used to advance the fraudulent scheme that Defendants perpetrated on Individual Plaintiffs and the Class.

100.     For the purpose of executing and/or attempting to execute their transaction to defraud and to obtain money by means of false pretenses, representations or promises, the Defendants and their co-conspirators, in violation of 18 U.S.C. §1343, transmitted and received by wire matter and things therefrom including but not limited to the policy contracts, illustrations, instructions, correspondence, advertisements, marketing materials, and other items.  These materials include *inter alia*:

a. September 12, 2003 policy contract;

b. September 13, 2008 Universal Life Insurance Policy Annual Statement;

c. September 26, 2009 Universal Life Insurance Policy Annual Statement;

d. September 12, 2012 Universal Life Insurance Policy Annual Statement;

e. May 17, 2013 letter to Allen Trust regarding increase in account value;

f. August 19, 2015 letter to Allen Trust regarding monthly deductions;

g. September 12, 2017 Universal Life Insurance Policy Annual Statement;

h. November 11, 2017 Life Insurance Illustration;

i. February 20, 2018 Life Insurance Illustration;

j. April 12, 2018 Life Insurance Illustration;

k. August 13, 2018 Life Insurance Illustration;

l. August 22, 2018 Life Insurance Illustration;

m. September 13, 2018 Universal Life Insurance Policy Annual Statement; and

n. October 4, 2018 Life Insurance Illustration.

101.   The Defendants' violations of 18 U.S.C. §1343 served at least two roles in the Enterprise.  First, many of these communications contained fraudulent misstatements or omissions.  Defendants knew that the Defendants were internally booking enormous Deficit Accounts within each policy account on a secret second set of books, but intentionally withheld this information from the Individual Plaintiffs and the Class in these communications with the Individual Plaintiffs and the Class.  Due to the Deficit Accounts that the Defendants were carrying on each of the policy accounts, Defendants also knew that they were not providing actual permanent life insurance with a lifetime death benefit to Individual Plaintiffs and members of the Class.  Second, in addition to

being fraudulent standing alone, these communications were used to advance the fraudulent scheme that Defendants perpetrated on Individual Plaintiffs and the Class.

102.    Defendants' efforts in connection with executing or attempting to execute their transactions to defraud and to obtain money by means of false pretenses, representations or promises, including without limitation acts done in violation of 18 U.S.C. §§1341 and 1343 because these acts amounted to a scheme or artifice to defraud for financial gain.

103.    In those matters and things sent or delivered by the Postal Service, by wire and through other interstate electronic media, Defendants and their co-conspirators falsely and fraudulently misrepresented and fraudulently suppressed material facts from Individual Plaintiffs and the Class as described above, in violation of 18 U.S.C. §§1341 and 1343.

104.    The predicate acts, including the predicate acts of mail and wire fraud, are continuing. The Defendants, and the other wrongdoers, on their own and as part of a common fraudulent scheme and conspiracy, defrauded Individual Plaintiffs as set out above.

105.    The Defendants and their co-conspirators intentionally and knowingly made these material misrepresentations and intentionally and knowingly suppressed material facts from Individual Plaintiffs and the Class, for the purpose of deceiving them and thereby obtaining financial gain. The Defendants either knew or recklessly disregarded that the misrepresentations and omissions described above were material. Individual Plaintiffs and the Class were injured as a result of the misrepresentations and

omissions in paying for a product (*i.e.*, permanent insurance with an initial term-like Guaranteed Period) that they were not actually receiving.

106.    The Defendants and their co-conspirators made continual use of mail and wire transmissions, in addition to communications made outside the interstate mail and wire systems, to effectuate their fraudulent scheme.  In addition to using in person, telephonic, and other means of communication to make fraudulent statements, the Defendants and their co-conspirators transmitted numerous specific fraudulent statements to Individual Plaintiffs and the Class through the mail, by fax, and/or by email.

107.    The Defendants and their co-conspirators intentionally and knowingly made these material misrepresentations and intentionally and knowingly suppressed material facts from Individual Plaintiffs and the Class, for the purpose of deceiving them and thereby obtaining financial gain. The Defendants and their co-conspirators either knew or recklessly disregarded that the misrepresentations and omissions described above were material. Individual Plaintiffs and the Class were injured as a result of the misrepresentations and omissions in purchasing and continuing to fund the Banner Policies.

108.    As set forth above, there are numerous examples of the predicate acts of fraud, including mail and wire fraud, committed by Defendants pursuant to their transactions to defraud Individual Plaintiffs.

109.    Individual Plaintiffs have therefore been injured in their business or property as a result of the Defendants' overt acts and racketeering activities.

E.    **Pattern of Racketeering Activity.**

110.    Individual Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

111.    As set forth above, the Defendants have engaged in a "pattern of racketeering activity," as defined in §1961(5) of RICO by committing and/or conspiring to commit at least two such acts of racketeering activity, as described above, within the past ten years.  Each such act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting upon similar victims, including Individual Plaintiffs and the Class.

112.    The multiple acts of racketeering activity committed and/or conspired to by Defendants, as described above, were related to each other and amount to and pose a threat of continued racketeering activity, and, therefore, constitute a "pattern of racketeering activity," as defined in 18 U.S.C. §1961(5).  Individual Plaintiffs allege that the course of conduct engaged in by the Defendants constituted both "continuity" and "relatedness" of the racketeering activity, thereby constituting a pattern of racketeering activity, as that term is defined in 18 U.S.C. §1961(5).  Individual Plaintiffs can show the relatedness prong because the predicate acts have "similar purposes, results, participants, or methods of commission or are related to the affairs of the Enterprise."  All predicate acts had the same purpose of utilizing the Enterprise to misrepresent the nature of the Banner Policies so that the Defendants could defraud Individual Plaintiffs.  Individual Plaintiffs allege that the continuity of the pattern of racketeering activity is "closed-ended" inasmuch as a series of related predicate offenses extended since at least 2003 (a

substantial period of time).  Moreover, the continuity of the pattern of racketeering can also be established under "open-ended continuity" as the predicate offenses are part of the Enterprise's regular way of doing business, and the predicates are attributed to Defendants' operations as part of a long-term association that existed for criminal purposes.  Further, the last act of racketeering activity that is alleged as the basis of Individual Plaintiffs' claims occurred within four years of a prior act of racketeering.

113.    Individual Plaintiffs and the Class therefore have been injured in their business or property as a result of Defendants' overt acts and racketeering activities as described above and throughout this Complaint.

## VIII.
## PLAINTIFFS' CLAIMS WERE TIMELY FILED OR, ALTERNATIVELY THE DISCOVERY RULE AND EQUITABLE TOLLING DEFERREDACCRUAL OF STATUTES OF LIMITATIONS AS TO ALL DEFENDANTS

114.    The Individual Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

115.    The causes of action asserted by the Individuals Plaintiffs against Defendants herein are timely filed because the Individual Plaintiffs' claims first accrued within the applicable limitation period for each claim.

116.    In the alternative, the causes of action asserted by the Individual Plaintiffs against Defendants herein are timely filed as the discovery rule and/or equitable tolling deferred accrual of the respective statutes of limitation for such causes of action.

117.    The Individual Plaintiffs did not and could not discover the wrongful acts of the Defendants or the injuries caused by the wrongful acts of the Defendants alleged

herein until, at the earliest, August 22, 2018, the date on which the Banner Defendants first provided the Individual Plaintiffs with any notice whatsoever of the existence of a secret set of books that the Banner Defendants were keeping on the Banner Policies, existence and amount of the purported Deficit Account that was being carried on the Individual Plaintiffs' Banner Policy account, and the fact that the Banner Defendants were demanding that the Individual Plaintiffs pay an amount almost six times the death benefit to keep the policy in place for the first year after the expiration of the Guaranteed Period.

118.    Prior to and up until this date, Defendants continued to advise the Individual Plaintiffs in writing that the Banner Policy was a permanent life insurance policy that could provide a death benefit for the remainder of Mrs. Allen's life and that the value of the policy account was $0 or higher (*i.e.*, not a negative amount).    In reliance on these written representations, the Individual Plaintiffs and the members of the Class were delayed and deterred from bringing their claims against Defendants earlier. Defendants' concealment therefore prevented the Individual Plaintiffs and the members of the Class from discovery of the nature of their claims.

119.    The Individual Plaintiffs and the members of the Class exercised due diligence in pursuing discovery of their claims during the time period that commenced with Defendants making misrepresentations and omissions during the marketing and promotion of the Banner Policies and continued through their discovery of the undisclosed "deficit" balance that was accumulating in the secret second set of books that the Banner Defendants were keeping on each Banner Policy account.

## IX.
## TOLLING OF STATUES OF LIMITATIONS AS TO
## ALL DEFENDANTS DUE TO FRAUDULENT CONCEALMENT

120.    The Individual Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

121.    The causes of action asserted by the Individual Plaintiffs, and on behalf of the Class, against Defendants are timely filed as Defendants and their co-conspirators fraudulently concealed the injuries and wrongful conduct alleged herein.

122.    The Defendants and their co-conspirators had actual knowledge of the injuries and wrongful conduct alleged herein, but concealed the injuries and wrongful acts and omissions alleged herein by intentionally remaining silent and/or making misrepresentations about the injuries and their wrongful conduct despite having a duty to inform Plaintiffs of such injuries and wrongful acts and omissions.  The Defendants' silence and misrepresentations prevented the Individual Plaintiffs from discovering their injuries and the Defendants' wrongful acts and omissions.

123.    The Defendants had a fixed purpose to conceal the wrongful conduct and injuries. The Individual Plaintiffs and the members of the Class reasonably relied on the Defendants' silence and misrepresentations to the detriment of the Individual Plaintiffs and the members of the Class.

## X.
## TOLLING OF STATUTE OF LIMITATIONS AS TO THE
## DEFENDANTS DUE TO CONTINUING VIOLATIONS DOCTRINE

124.    The Individual Plaintiffs repeat, reallege, and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

125.    The causes of action asserted by the Individual Plaintiffs against the Defendants are timely filed pursuant to the Continuing Violations Doctrine.

126.    Throughout the Guaranteed Periods of the Banner Policies, Defendants continued to advise the Individual Plaintiffs and the members of the Class in written materials, and the Individual Plaintiffs and members of the class continued to rely on Defendants' advice in purchasing and continuing to pay premiums on the Banner Policies and continued to believe they could and should rely on their advice.

127.    The Banner Defendants, as part of the conspiracy between all of the Defendants and the Other Participants, knowingly circulated written Annual Statements and written illustrations that were false to each of the Individual Plaintiffs and members of the Class that purported to show the account value of each Banner Policy, but intentionally neglected to inform each of the Individual Plaintiffs and members of the Class of the enormous "deficit" balances that were accumulating in each such policy account.

128.    This series of wrongs on the part of the Defendants constitutes a continuing violation such that the individual wrongs should be aggregated for purposes of the statute of limitations.

## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF RICO 18 U.S.C. §1962(c)

129.    Individual Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

130.    Section 1962(c) of RICO provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

131.    Individual Plaintiffs incorporate, as though fully set out herein, their allegations regarding Enterprise at Paragraphs 80-90 herein.

132.    Individual Plaintiffs incorporate, as if fully set forth herein, their allegations that Defendants have engaged in a pattern of racketeering activity at Paragraphs 110-113 herein.

133.    The Defendants, who are associated with and are part of the Enterprise, conduct and have conducted the Enterprise's affairs through a pattern of racketeering activity, as set forth in this Complaint. Through the fraudulent and wrongful conduct described in this Complaint, Defendants seek and have sought to deprive Individual Plaintiffs and members of the Class of money and property rights. In order to successfully execute their scheme in the manner set forth in this Complaint, Defendants must have a system that allows Defendants to access their victims in a manner to effectuate the fraudulent transactions. The Enterprise allows the Defendants this access.

134.    With respect to the activities alleged herein, the Defendants have acted at all times with malice toward Individual Plaintiffs and members of the Class in their efforts to acquire and maintain an interest in an Enterprise that affects interstate commerce.

135.    In carrying out the overt acts and fraudulent scheme described above, the Defendants have engaged in conduct in violation of federal laws, including *inter alia* 18 U.S.C. §§1341 and 1343, 18 U.S.C. §§1341 and 1346, 18 U.S.C. §§1343 and 1346, and 18 U.S.C. §1961, et seq. as set forth more fully above.

136.    Therefore, Defendants have each engaged in "racketeering activity" which is defined in §1961(1) of RICO to mean "any act which is indictable under any of the following provisions of 18 U.S.C. §1341 (relating to mail fraud) and §1343 (relating to wire fraud) ...."

137.    As a proximate result of Defendants' unlawful pattern of illegal fraudulent conduct as described above, Individual Plaintiffs and members of the Class have been injured in their business or property as described above.

### COUNT II
### VIOLATIONS OF RICO 18 U.S.C. §1962(d)
### BY CONSPIRING TO VIOLATE 18 U.S.C. §1962(c)

138.    Individual Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

139.    This claim for relief arises under 18 U.S.C. §1964(a) of RICO and seeks relief from the Defendants' activities described herein for violations of 18 U.S.C. §1962(d) for their conspiracy to violate 18 U.S.C. §1962(c).

140.    Individual Plaintiffs incorporate, as if fully set forth herein, their allegations regarding the Enterprise at Paragraphs 80-90 herein.

141.    Individual Plaintiffs incorporate, as if fully set forth herein, their allegations that Defendants have engaged in a pattern of racketeering activity at Paragraphs 110-113 herein.

142.    Absent Defendants' conspiracy and joint efforts, Defendants' scheme would not be successful. Acting jointly, Defendants have and have possessed greater power, have been able to exert greater influence, have been able to successfully engage in the activities set forth herein, and have had greater ability to conceal their activities.

143.    Defendants have also violated §1962(d) by conspiring to violate 18 U.S.C. §1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the §1962(c) Enterprise(s) described previously through a pattern of racketeering activity.

144.    Defendants, their employees, and multiple agents have been joined in the conspiracies to violate 18 U.S.C. §1962(c) in violation of §1962(d) by various third parties not named as Defendants herein, such as the Other Participants.

145.    As demonstrated in detail above, the Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy including systemic fraudulent practices designed to defraud the Individual Plaintiffs and the Class of money and other property interests.

146.    The nature of the above described acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that Defendants not only agreed to the objective of a violation of 18 U.S.C. §1962(d) by conspiring to violate

18 U.S.C. §1962(c), but also they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

147. The Defendants have engaged in the commission of and continue to commit overt acts and the following described unlawful racketeering predicate acts that have and continue to generate income or proceeds received by Defendants from such pattern of racketeering activity, including:

      a.    Multiple instances of mail and wire fraud violations of 18 U.S.C. §§1341 and 1343; and

      b.    Multiple instances of travel in interstate commerce to attempt to and to actually commit mail fraud and wire fraud.

148. As a proximate result of Defendants' conduct as described above, Individual Plaintiffs and the Class have been injured in their business or property as described above.

## COUNT III
## BREACH OF FIDUCIARY DUTY

149. Individual Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

150. The Defendants, as the insurance and underwriting advisors of Individual Plaintiffs and the members of the Class, were fiduciaries of the Individual Plaintiffs and the members of the Class. Individual Plaintiffs and the members of the Class placed their trust and confidence in Defendants, and Defendants had influence and superiority over the Individual Plaintiffs and the members of the Class. Thus, Defendants owed

Individual Plaintiffs and the members of the Class the duties of honesty, loyalty, and care.

151.    Defendants breached their fiduciary duties to Individual Plaintiffs and the members of the Class by, among other things:

a.    Orchestrating the design, development, implementation and continuation of the Banner Policies;

b.    Misrepresenting, in the written materials provided to the Individual Plaintiffs and members of the Class, the Banner Policies as permanent insurance that could provide a death benefit for the remainder of the Insureds' lives;

c.    Misrepresenting the value of each Banner Policy account in various written materials provided to the Individual Plaintiffs and members of the Class;

d.    Failing to disclose to the Individual Plaintiffs and members of the Class that the Banner Defendants were keeping a second set of books that purported to carry an enormous Deficit Account that was allocated to each of the Banner Policy accounts;

e.    Failing to disclose to the Individual Plaintiffs that the value of their respective Banner Policy account was negative at any point in time;

f.    Failing to disclose to the Individual Plaintiffs that the premium due in the first year after the expiration of the Guaranteed Period would include a Deficit Account that had been accumulating and growing in their account for two decades  to the point where the premium in this single year was a multiple of up to  6 times the death benefit; and

g.    Failing to disclose that the premium due in the first year after the expiration of the Guaranteed Period was in an amount so excessive and unconscionable that no reasonable person would extend the Banner Policy beyond the Guaranteed Period.

152.    The Defendants' breaches were a proximate cause of damages to Individual Plaintiffs and the Class.  In reasonable reliance on Defendants' representations regarding

the Banner Policies, Individual Plaintiffs and the Class: (1) purchased the Banner Policies and continued to pay fees and premiums to the Banner Defendants to keep the policies in place through the Guaranteed Period; and (2) did not avail themselves of legitimate opportunities to obtain permanent life insurance.   But for Defendants' breaches, Individual Plaintiffs and the Class would not have purchased the Banner Policies and paid substantial fees and premiums in connection therewith and/or failed to avail themselves of other legitimate opportunities to obtain permanent life insurance.

153.    As a proximate cause of the foregoing, Individual Plaintiffs have been injured in an actual amount to be proven at trial but in excess of $75,000.00 and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT IV
## NEGLIGENT MISREPRESENTATION

154.    Individual Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

155.    During the promotion of the Banner Policies and continuing through the Guaranteed Period when the Individual Plaintiffs and members of the Class were paying the guaranteed premiums to keep the policies in place, Defendants each negligently made numerous affirmative written misrepresentations and omissions of material fact to Individual Plaintiffs and members of the Class, including but not limited to:

a.    Orchestrating the design, development, implementation and continuation of the Banner Policies in a way that was not, in fact, "no lapse";

b.    Misrepresenting, in the written materials provided to the Individual Plaintiffs and members of the Class, the Banner Policies as permanent insurance that could provide a death benefit for the remainder of the Insureds' lives;

c.    Misrepresenting the value of each Banner Policy account in various written materials provided to the Individual Plaintiffs and members of the Class;

d.    Failing to disclose to the Individual Plaintiffs and members of the Class that the Banner Defendants were keeping a second set of books that purported to carry an enormous "deficit" that was allocated to each of the Banner Policy accounts;

e.    Failing to disclose to the Individual Plaintiffs that the value of their respective Banner Policy accounts was negative at any point in time;

f.    Failing to disclose to the Individual Plaintiffs that the premium due in the first year after the expiration of the Guaranteed Period would include a "deficit" that had been accumulating and growing in their account for two decades to the point where the premium in this single year was a multiple of up to 6 times the death benefit and, in many if not all cases, exceeded the Internal Revenue Service regulations for the maximum premium allowed in order for the account to remain an insurance policy; and

g.    Failing to disclose that the premium due in the first year after the expiration of the Guaranteed Period was in an amount so excessive and unconscionable that no reasonable person would extend the policy beyond the Guaranteed Period.

156.    Defendants either knew or reasonably should have known that their representations were improper, inaccurate, or wrong.    Defendants either knew or reasonably should have known that their failures to disclose material information to

Individual Plaintiffs and members of the Class were improper and wrong and would mislead Individual Plaintiffs and members of the Class.

157.    The Defendants' negligent and grossly negligent misrepresentations were a proximate cause of the damages of the Individual Plaintiffs and members of the Class.  In reasonable reliance on Defendants' advice regarding the Banner Policies, Individual Plaintiffs and members of the Class: (1) purchased the Banner Policies and continued to pay fees and premiums to the Banner Defendants to keep the Banner Policies in place through the Guaranteed Period; and (2) did not avail themselves of legitimate opportunities to obtain permanent life insurance.

158.    But for Defendants' negligent and grossly negligent misrepresentations and material omissions described above, Individual Plaintiffs and members of the Class would not have (1) purchased the Banner Policies and continued to pay fees and premiums to the Banner Defendants to keep the Banner Policies in place through the Guaranteed Period; and (2) did not avail themselves of legitimate opportunities to obtain permanent life insurance.

159.    The Defendants' conduct set forth herein proximately caused Individual Plaintiffs and members of the Class to suffer injury in that Individual Plaintiffs and members of the Class (1) purchased the Banner Policies and continued to pay fees and premiums to the Banner Defendants to keep the Banner Policies in place through the Original Term; and (2) did not avail themselves of legitimate opportunities to obtain permanent life insurance.

160.    As a proximate cause of the foregoing, Individual Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $75,000.00 and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest and costs.

## COUNT V
## DISGORGEMENT

161.    Individual Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

162.    As a result of Defendants' breach of their fiduciary duties, they should be required to disgorge all payments received by them from Individual Plaintiffs and members of the Class or from any other entity for work performed in connection with the Banner Policies.

163.    The amount of money the Defendants must disgorge is far in excess of $75,000.00.  In addition, Individual Plaintiffs and members of the Class seek an award of attorneys' fees, interest, and costs.

## COUNT VI
## BREACH OF CONTRACT AND BREACH
## OF THE DUTY OF GOOD FAITH AND FAIR DEALING
## (IN THE ALTERNATIVE)

164.    Individual Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

165.    Individual Plaintiffs and members of the Class entered into the agreements, which were valid and existing agreements with Defendants (collectively, the "Policies"). These agreements imposed upon the Banner Defendants numerous obligations including, without limitation, the obligations of keeping the insurance policy in place through the Maturity Date (as defined in the Policies) so long as the total premiums paid are sufficient to keep the Policies in place.

166.    The Banner Defendants anticipatorily breached the foregoing obligations by requiring payment of a premium in the first year after the expiration of the Guaranteed Period that was in excess of the amount that any reasonable person would pay to keep the policy in force beyond the Guaranteed Period.

167.    In addition, the Banner Defendants owed the Individual Plaintiffs and members of the Class a duty of good faith and fair dealing under applicable law.  This contractual duty includes all promises which a reasonable person in the position of Individual Plaintiffs and members of the Class would be justified in understanding were included and it prohibits Defendants from acting in a manner which would have the effect of destroying or injuring the right of Individual Plaintiffs and members of the Class to receive the fruits of the agreements.  In this instance, that includes explicit and/or implicit promises that the Banner Policies could be extended beyond the Guaranteed Period through the payment of additional premiums that were economically reasonable.

168.    Based on the foregoing, the Banner Defendants breached their duty of good faith and fair dealing, by, among other things,

a.     Keeping a secret second set of books that purported to carry an enormous Deficit Account for each of the Banner Policy accounts;

b.     Providing the Individual Plaintiffs and members of the Class with illustrations and Annual Statements that intentionally withheld the fact that the Banner Defendants were allocating the enormous Deficit Account to each Banner Policy account in determining the true value of the account; and

c.     Representing to the Individual Plaintiffs and members of the Class in the policy documents that the Banner Policies were permanent insurance that could provide a death benefit through the remainder of the Insureds' lives when, in reality, the Banner Policies were intentionally structured so that there was no chance that any reasonable person would extend the policy beyond the Guaranteed Period.

169.   Individual Plaintiffs and members of the Class fully performed their obligations under the Policies and thus did not contribute to Defendants' breaches in any way.

170.   As a result of Defendants' breaches of contract and breaches of the duty of good faith, Individual Plaintiffs and members of the Class have suffered injury, in that they (1) purchased the Banner Policies and continued to pay fees and premiums to the Banner Defendants to keep the Banner Policies in place through the Guaranteed Period; and (2) did not avail themselves of legitimate opportunities to obtain permanent life insurance.

171.   As a proximate cause of the foregoing, Individual Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $75,000.00 per individual and should be awarded all actual, consequential, and incidental damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT VII
## FRAUD

172.    Individual Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

173.    In order to induce Individual Plaintiffs and members of the Class to pay them substantial fees, Defendants directly—and indirectly—through the Other Participants—made numerous knowingly false affirmative misrepresentations and intentional omissions of material fact to Individual Plaintiffs and members of the Class, including but not limited to:

    a.    Orchestrating the design, development, implementation and continuation of the Banner Policies in a way that was not, in fact, "no lapse";

    b.    Misrepresenting, in the written materials provided to the Individual Plaintiffs and members of the Class, the Banner Policies as permanent insurance that could provide a death benefit for the remainder of the Insureds' lives;

    c.    Misrepresenting the value of each Banner Policy account in various written materials provided to the Individual Plaintiffs and members of the Class;

    d.    Failing to disclose to the Individual Plaintiffs and members of the Class that the Banner Defendants were keeping a second set of books that purported to carry an enormous "deficit" that was allocated to each of the Banner Policy accounts;

    e.    Failing to disclose to the Individual Plaintiffs that the value of their respective Banner Policy accounts was negative at any point in time;

    f.    Failing to disclose to the Individual Plaintiffs that the premium due in the first year after the expiration of the Guaranteed Period would include a "deficit" that had been accumulating and growing in their

account for two decades to the point where the premium in this single year was a multiple of up to 6 times the death benefit and, in many if not all cases, exceeded the Internal Revenue Service regulations for the maximum premium allowed in order for the account to remain an insurance policy; and

g.    Failing to disclose that the premium due in the first year after the expiration of the Guaranteed Period was in an amount so excessive and unconscionable that no reasonable person would extend the policy beyond the Guaranteed Period.

174.    The above affirmative misrepresentations and/or intentional omissions of material fact made by each Defendant were false when made, and the Defendants knew these representations to be false when made with the intention that Individual Plaintiffs and members of the Class rely upon them in entering into the Banner Policies and continuing to pay the premiums to keep the policies in place through the Guaranteed Period.    In addition, the above affirmative misrepresentations and/or intentional omissions of material fact were committed knowingly by the Defendants.

175.    In reasonable reliance on the Defendants' false affirmative misrepresentations and intentional omissions of material facts regarding the Banner Policies, Individual Plaintiffs and members of the Class: (1) purchased the Banner Policies and continued to pay fees and premiums to the Banner Defendants to keep the policies in place through the Guaranteed Period; and (2) did not avail themselves of legitimate opportunities to obtain permanent life insurance.    But for Defendants' breaches, Individual Plaintiffs and the Class would not have purchased the Banner Policies and paid substantial fees and premiums in connection therewith and/or failed to avail themselves of other legitimate opportunities to obtain permanent life insurance.

176.    As a result of Defendants' conduct set forth herein, Individual Plaintiffs and members of the Class have suffered injury in that they: (1) purchased the Banner Policies and continued to pay fees and premiums to the Banner Defendants to keep the policies in place through the Guaranteed Period; and (2) did not avail themselves of legitimate opportunities to obtain permanent life insurance.

177.    As a proximate cause of the foregoing injuries, Individual Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $75,000.00 and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT VIII
## AIDING AND ABETTING

178.    Individual Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

179.    As described more fully throughout this Complaint, each of the Defendants aided and abetted the wrongful conduct (including fraud and breaches of fiduciary duty) of each of the other Defendants.  Each Defendant was aware of its respective role and responsibility in the overall tortious activity and intentionally provided aid and substantial assistance in the other Defendants' tortious activity.

180.    As a proximate cause of Defendants' conduct set forth herein, Individual Plaintiffs have suffered injury and damages.

181.   Individual Plaintiffs have been injured in an actual amount to be proven at trial, but in excess of $75,000.00, and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT IX
## CIVIL CONSPIRACY

182.   Individual Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

183.   As described more fully above, the Defendants and the Other Participants knowingly acted in concert to design, market, sell, issue, and maintain the fraudulent Banner Policies.   In furtherance of their conspiracy, the Defendants and the Other Participants conspired to perpetrate fraud on the Individual Plaintiffs and members of the Class.   In doing so, the Defendants and the Other Participants acted with full knowledge and awareness that the transactions were designed to give the false impression that they were a permanent insurance product that could provide a death benefit for the remainder of the Insureds' lives.

184.   The Defendants and the Other Participants acted in the respective roles as described above according to a predetermined and commonly understood and accepted plan of action to perpetrate fraud on Individual Plaintiffs and members of the Class, all for the purposes of obtaining fees and premiums from these individual and entities.   The Defendants and the Other Participants authorized, ratified, and/or affirmed the fraudulent

misrepresentations and omissions of material fact that each Defendant and/or Other Participant made to Individual Plaintiffs and members of the Class.

185.    The acts of the Defendants and the Other Participants were contrary to numerous provisions of law, as stated above, and constitute a conspiracy to perpetrate fraud on Individual Plaintiffs and members of the Class.

186.    There was a meeting of the minds between and among the Defendants and the Other Participants to commit the unlawful acts alleged herein, including a conspiracy to perpetrate fraud on Individual Plaintiffs and members of the Class.  The conspiracy to commit these unlawful and fraudulent acts proximately caused and continue to cause damages to Individual Plaintiffs and members of the Class as previously set forth herein.

187.    As a result of Defendants' conduct set forth herein, Individual Plaintiffs and members of the Class have suffered injury in that they: (1) purchased the Banner Policies and continued to pay fees and premiums to the Banner Defendants to keep the policies in place through the Guaranteed Period; and (2) did not avail themselves of legitimate opportunities to obtain permanent life insurance.

188.    Individual Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $75,000.00 and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT X
## UNFAIR PRACTICES – BUSINESS AND
## PROFESSIONS CODE § 17200, *et seq.*[7]

189.   Individual Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

190.   Individual Plaintiffs bring this action in equity to enjoin a scheme of unlawful, unfair or fraudulent business practices (Business and Professions Code section 17200).  The power of the court to enjoin such practices is found in the general equitable powers of the court and in Business and Professions Code section 17204.  Such code section also empowers the court to make any other orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment of practices which violate such code section or which may be necessary to restore any person in interest any money or property which may have been acquired by means of any practice which violates such code section.  The Individual Plaintiffs bring this action on behalf of all members of the general public of the State of California as provided for in Business and Professions Code section 17204.

191.   Such acts of Defendants as described above constitute unfair, unlawful and fraudulent business practices and constitute violations of California Business and Professions Code sections 17200, *et seq.*

---

[7] For members of the Class who are residents of other states, this Count will be under the applicable consumer protection statute (or similar statute) for each such member's respective state.

192.    As a result of the business practices described above, Individual Plaintiffs, on behalf of the People of the State of California and pursuant to Business and Professions Code section 17203, are entitled to an order enjoining such future conduct on the part of Defendants and such other orders and judgment which may be necessary, including the appointment of a receiver to restore to any person in interest any money paid for the Banner Policies, plus interest, as a result of the acts of Defendants.

## XI.
## PRAYER FOR RELIEF

193.    Based upon the foregoing, Individual Plaintiffs request that Defendants be cited to appear and answer; that the requested class be certified for trial and/or settlement; and that on final hearing Individual Plaintiffs and the members of the Class have judgment against Defendants, jointly and severally for:

a.    actual, consequential, and incidental damages;

b.    disgorgement;

c.    pre- and post-judgment interest at the highest legal rate allowed by law;

d.    all attorneys' fees and costs in pursuing this matter;

e.    punitive and treble damages in an amount to be determined at trial; and

f.    such other and further relief, both at law and in equity, to which Individual Plaintiffs and the Class may show themselves to be justly entitled.

Respectfully submitted,

/s/

Kyle G. Bates, (SBN 299114)
Ryan M. Hecht, (SBN 322396)
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
kbates@schneiderwallace.com
rhecht@schneiderwallace.com

David R. Deary*
W. Ralph Canada, Jr.*
Jevin R. Sloan*
LOEWINSOHN FLEGLE DEARY
SIMON, LLP
12377 Merit Drive, Suite 900
Dallas, Texas 75251
(214) 572-1700 Telephone
(214) 572-1717 Facsimile
DavidD@lfdslaw.com
RalphC@lfdslaw.com
JevenS@lfdslaw.com

*Pro Hac Vice application forthcoming

Attorneys for Plaintiffs